**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

RALPH COUNTRYMAN   )
           )  3:06-cv-00236-ECR (VPC)
   Plaintiff,    )
           )
vs.        )  <u>**REPORT AND RECOMMENDATION**</u>
           )  <u>**OF U.S. MAGISTRATE JUDGE**</u>
           )
BILL DONAT, *et al*.,   )
           )  February 8, 2008
   Defendants.  )
           )
_____)

   This Report and Recommendation is made to the Honorable Edward C. Reed, Jr., United States District Judge.  The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.  Before the Court is plaintiff's motion for summary judgment (#45).  Defendants opposed (#54) and plaintiff did not file a reply.  Also before the court is defendants' motion for summary judgment (#54).  Plaintiff opposed (#55) and defendants replied (#57).  Plaintiff filed a supplemental opposition (#66) and defendants filed a supplemental reply (#68).[1]  For the reasons stated below, the court recommends that plaintiff's motion for summary judgment (#45) be denied and defendants' motion for summary judgment (#54) be granted in part and denied in part.

## I.  HISTORY & PROCEDURAL BACKGROUND

   Plaintiff Ralph Countryman, a *pro se* prisoner, is currently incarcerated by the Nevada Department of Corrections ("NDOC") at Southern District Correctional Center ("SDCC") (#13).  Plaintiff brings his first amended complaint pursuant to 42 U.S.C. § 1983 alleging that prison officials violated his First Amendment right to freely exercise his religion, his Fourteenth Amendment right to equal protection, and his rights pursuant to 42 U.S.C. § 2000cc et seq., the

---

[1] The court granted leave to the parties to file supplemental pleadings (#63).

Religious Land Use and Institutionalized Persons Act ("RLUIPA") (#36).  Plaintiff names as defendants Bill Donat, Nevada State Prison ("NSP") Warden; James Baca, NSP Associate Warden; Glen Whorten, former NDOC Director; and Kenny Guinn, former Nevada Governor.[2] *Id*.

Generally, plaintiff alleges that defendants violated his constitutional rights by instituting a policy at NSP prohibiting some religious groups from meeting without an outside sponsor, and denying those inmates the right to lead their own religious services.  *Id*.  Plaintiff additionally alleges that defendants violated his religious and equal protection rights by banning guitars at NSP.  *Id*.

The Court notes that the plaintiff is proceeding *pro se*.  "In civil rights cases where the plaintiff appears *pro se*, the court must construe the pleadings liberally and must afford plaintiff the benefit of any doubt."  *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

## II.  DISCUSSION & ANALYSIS

### A.  Discussion

#### 1. Summary Judgment Standard

Summary judgment allows courts to avoid unnecessary trials where no material factual disputes exist.  *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th Cir. 1994).  The court grants summary judgment if no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  In deciding whether to grant summary judgment, the court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party.  *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).  In inmate cases, the courts must

> [d]istinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our

---

[2] Defendants Donat and Baca are named in both their individual and official capacities (#36). Defendants Whorten and Guinn are named in their official capacities for injunctive relief only.  *Id*.

> inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 126 S.Ct. 2572, 2576 (2006). Where reasonable minds could differ on the material facts at issue, summary judgment should not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears the burden of informing the court of the basis for its motion, and submitting evidence which demonstrates the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson*, 477 U.S. at 248. Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

**B. Analysis**

As plaintiff and defendants each filed motions for summary judgment, the court addresses the parties' arguments and evidence concurrently.

**1. Procedural Issues**

**a. Official Capacity**

Defendants Donat and Baca argue that plaintiff cannot bring claims against them in their official capacities pursuant to section 1983 (#51, pp. 25-27). The Eleventh Amendment stands for the proposition that a state may not be sued by an individual without its consent. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996). The Supreme Court has held that a suit against a state official in his or her official capacity is not a suit against that official; rather, it is a suit against the official's office. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Therefore, an official acting in his or her official capacity is acting as the state. *Id*. The state and

3

1   its officials are not considered "persons" within the meaning of section 1983; thus, "they cannot

2   be held liable under the statute for money damages."  *Bank of Lake Tahoe v. Bank of America*,

3   318 F.3d 914, 918 (9th Cir. 2003).

4       Plaintiff brings claims for money damages against defendants Donat and Baca in both

5   their individual and official capacities (#36).  Since defendants in their official capacities are not

6   "persons" pursuant to section 1983, the court grants summary judgment to defendants Donat and

7   Baca in their official capacities for all claims of money damages.

8                    **b. Prospective Injunctive Relief**

9       Defendants Whorten and Guinn, both named in their official capacities, argue that plaintiff

10  has no standing to seek injunctive relief because he is no longer housed at NSP is not in

11  immediate danger of a direct injury (#51, pp. 24-25).  State officials sued in their official

12  capacities for prospective injunctive relief are considered "persons" for the purposes of section

13  1983.  *Doe v. Lawrence Livermore Nat. Laboratory*, 131 F.3d 836, 839 (9th Cir. 1997).

14  However, plaintiffs who seek the jurisdiction of the federal courts must satisfy the threshold

15  requirement of alleging an actual case or controversy.  *City of Los Angeles v. Lyons*, 461 U.S. 95,

16  101 (1983).  A plaintiff not only must demonstrate a "personal stake in the outcome," but also

17  must prove that he "has sustained or is in immediate danger of sustaining some direct injury as

18  the result of the challenged official conduct and the injury or threat of injury must be both real

19  and immediate, not conjectural or hypothetical."  *Id.* (citations omitted).  Where a plaintiff seeks

20  prospective injunctive relief, the plaintiff "must demonstrate 'that he is realistically threatened

21  by a repetition of (the violation).'"  *Armstrong v. Davis*, 275 F.3d 849, 860-61 (9th Cir. 2001)

22  (citing *Lyons*, 461 U.S. at 109).

23      Plaintiff is no longer incarcerated at NSP where the alleged violations occurred – he is

24  presently incarcerated at SDCC, and has been since late 2006 (#13).  Indeed, plaintiff testified that

25  "because I am no longer there, what goes on up there now does not really affect me in any way"

26  (#51, Exhibit 1, p. 65).  There is no "real or immediate" injury demonstrated here, nor is there a

    realistic probability of a repetition of the alleged violations – plaintiff has neither argued nor

1   demonstrated that there is a plan to transfer him back to NSP.  Plaintiff lacks standing to request

2   prospective injunctive relief.  The court dismisses defendants Whorten and Guinn.[3]

3         **2. Merits**

4         The court now turns to the merits of plaintiff's claims against defendants Donat and Baca

5   in their individual capacities.

6               **a. Religious Services**

7                 **(1) Allegations**

8         In count I, plaintiff alleges that during his incarceration at NSP, he worshipped as a

9   member of the Latter Day Saints ("LDS") and the Kairos communities, and attended the

10   Chaplain's Christian services (#36).[4]  Plaintiff claims that he was listed as an "inmate facilitator"

11   of both LDS and Kairos, and that he played music for the LDS, Kairos, Catholic and Chaplain's

12   services.  Plaintiff alleges that on December 7, 2005, defendants cancelled all religious services,

13   stating that they would be restored once outside volunteers were found to facilitate the services.

14   Plaintiff further alleges that defendants unilaterally overruled an NDOC regulation permitting

15   inmate-led religious services.  Plaintiff also claims that defendants closed a security post next to

16   the chapel, creating the lack of security which defendants cite to in order to justify their policies.

17   In count II, plaintiff alleges that defendants violated his equal protection rights by allowing

18   similarly-situated Muslim, Native American, Wiccan, Asatru, Rastafarian, and Spanish-speaking

19   Christian inmates to hold inmate-led services, meet without outside volunteers, and to meet with

20   little or no correctional officer supervision while denying plaintiff's religious groups these

21   privileges.

22                **(2) Evidence**

23         Administrative Regulation ("AR") 810 governs religious activities within the NDOC

24

25         [3] Defendants also originally argued that plaintiff failed to exhaust his administrative remedies as to

26   certain claims (#51); however, they have since withdrawn that argument (#68).

         [4] Plaintiff testified that Kairos is a non-denominational Christian group (#51, Exhibit 1, p. 11).

system (#51, Exhibit 3).  AR 810 provides that "Faith Group worship services are permitted under the leadership of inmates or volunteers, when available."  *Id*., AR 810.05 (1.1.1).  It further provides that "All inmates will have access to a Chaplain, or other special approved Faith Group volunteers, upon request."  *Id*., AR 810.01 (1.5).  With the assistance of the Warden's designee, each institution's chaplain is responsible for supervising volunteers and initiating Faith Group programs.  *Id*., AR 810.02 (1.1) and AR 810.04 (1.4).  The chaplain prepares the schedule for use of the chapel; however, "If a chapel is not available, the Warden/designee, will designate an area for religious activities in an available area that meets the security needs of the facility."  *Id*., AR 810.04 (1.11.1).  The chaplain is required to accommodate all Faith Groups, and the Warden/designee must "ensure that sufficient time is scheduled in the facility for religious purposes."  *Id*., AR 810.04 (1.11.2-3).

The evidence reveals that plaintiff grieved the cancellation of services, the requirement that outside volunteers be present at services, and the prohibition on inmate-led services (#66, Exhibit B).  In early 2006, defendants told plaintiff that they were reviewing the religious procedures and were attempting to find outside volunteers.  *Id*.  On February 21, 2006, Director Nash Holmes stated in response to plaintiff's grievance:

> AR 801 does provide for inmate-facilitated religious services. When the new warden came on and had to make some corrections due to security issues, that was temporarily suspended.  The warden is permitted to take steps he deems necessary when security or health and safety are at issue.  Efforts are being made to find outside sponsors to facilitate all religious services.  Your grievance is denied, but religious services led by inmates are being reinstated as long as there are no security concerns.

*Id*.  On March 10, 2006, in response to another inmate's grievance, the Director stated:

> AR 810 permits worship services led by inmates or volunteers. Outside sponsors cannot always be found.  If one cannot, the chaplain (staff or volunteer) is considered the sponsor.  Or the warden can appoint a staff member to serve as sponsor. Nevertheless, you can worship without that sponsor present.  You can resume worship activities immediately.  Grievance upheld.

*Id*.  On March 13, 2006, after being presented with the Director's February 21 response, defendant Donat informed plaintiff:

6

1

2

3

> Steps are still being taken to locate outside sponsors. The response in the grievance noted that inmate run programs were reinstated as long as there are no security concerns. The location of the chapel limits custody supervision, which remains a security concern – since there is no one else to monitor or supervise.

4   *See* #66, Exhibit C.

5   Defendant Donat submits two declarations (#51 and #54). He states when he became the

6   NSP warden in October 2005, there were twenty-four rehabilitative programs meeting at NSP in

7   addition to a dozen or more religious groups (#51, Decl. of Bill Donat, ¶ 4). Defendant Donat

8   states that his primary focus was on security, and at that time, many inmate groups were meeting

9   either without supervision or without adequate supervision. *Id*. at ¶¶ 5-6.

10   Defendant Donat explains that the NSP chapel is located away from the main

11   administration building (where the visiting room and central control are located), in a separate

12   building through the law library. *Id*. at ¶ 10. The chapel is a windowless room, with a solid door,

13   and there is no tower coverage or ability to supervise from any location aside from the law library.

14   *Id*. There is a video camera which the law librarian can use to view the chapel when the librarian

15   is present, Monday through Friday, 9:00 a.m. to 5:00 p.m. *Id*. Defendant Donat states that at one

16   time, there may have been a security post called "six post" in what is now the Chaplain's office

17   off of the chapel; however, when he became warden, there was only a TV and some furniture in

18   that room (#54, Decl. of Bill Donat, ¶ 10). Correctional officers had been using the room as an

19   unofficial (and unauthorized) break room, and defendant Donat closed it because it was not set

20   up as a security post. *Id*.

21   Defendant Donat states that he issued an order to "**all** religious groups" that they could

22   meet only if there was an outside volunteer present, which was meant only to ensure that all

23   groups had proper supervision, and to protect the safety and security of the staff and inmates (#51,

24   Decl. of Bill Donat, ¶ 11) (emphasis in original). However, defendant Donat admits, "It became

25   apparent that it was not going to be possible to have every religious group run and/or supervised

26   by an outside volunteer," so, in such cases, "other arrangements were made so as to ensure that

the inmate religious groups were properly supervised" (#54, Decl. of Bill Donat, ¶ 12). For

1   example, groups without sponsors are permitted to meet in the chapel during the hours the law

2   librarian is present, to meet outside monitored by the gun towers, and to meet in the visiting room

3   supervised by central control.  *Id.*  Further, defendant Donat states that he informed "**all** religious

4   groups with participating volunteers" that inmates were not permitted to lead services.  *Id.* at ¶

5   15 (emphasis in original).  Defendant Donat declares that "the disruption to a handful of religious

6   services lasted no more than 60 days, and in most instances was resolved in less than 30 days."

7   *Id.* at ¶ 14.

8          Defendants also submit an affidavit which states that NSP's regular chaplain, Jane

9   Foraker-Thompson ("Chaplain Jane"), was on medical leave between August 2005 and March

10  2006 (#51, Decl. of Stacey Zimmerman).  Plaintiff's evidence indicates that during the time

11  Chaplain Jane was on medical leave, a volunteer chaplain assisted with services at NSP (#66,

12  Exhibit H).

13                          **(a) Friday Evening Kairos Service**

14         Plaintiff testified during his deposition that the Kairos group held a weekly Friday service

15  in the NSP visiting room (#51, Exhibit 1, pp. 11-12).  Inmates previously ran the service when

16  volunteers failed to attend.  *Id.*, p. 14.  Plaintiff and other inmates would go in early, set up, and

17  start playing music.  *Id.*, p. 18.  Inmates would arrive between 5:30 and 6:00 p.m., and the service

18  would begin around 6:00 p.m.  *Id.*, p. 19.  The service included readings from the gospel, a talk

19  from one of the volunteers or an inmate, and small group discussions.  *Id.*, pp. 20-21.  Plaintiff

20  affirms that the small groups and individual participation are important to the Kairos service (#66,

21  Exhibit A, ¶¶ 19-20, 24).  Plaintiff testified that after December 7, 2005, if the volunteers did not

22  come, the service was cancelled (#51, Exhibit 1, pp. 22-23).  This service was cancelled

23  approximately four to five times between December 2005 and April 2006, although plaintiff

24  admits that some of these cancellations were due to a "TB scare."  *Id.*, pp. 23- 24.  Plaintiff

25  further testified that security often failed to escort the volunteers to the visiting room until 6:00

26  p.m. *Id.*, p. 25.  Inmates were prohibited from leading or speaking at the services and from giving

the sermon, although inmates were permitted to do readings.  *Id.*, p. 26.

1

### (b) Sunday Morning Episcopal Service

2       Plaintiff testified that Chaplain Jane led the Sunday morning Episcopal service in the

3 chapel.  *Id.*, pp. 12, 33-34.  Plaintiff played music during this service, and between the time

4 Chaplain Jane left on medical leave and December 7, 2005, the service was inmate-led.  *Id.*, p.

5 37.  However, the service was cancelled on December 7, 2005, and did not resume until Chaplain

6 Jane returned from medical leave.  *Id.*, p. 42.  Inmates proposed to have an approved volunteer

7 named Pierre Hathaway lead the service in Chaplain Jane's absence, but defendants either

8 improperly disapproved Mr. Hathaway, or discouraged him from being a volunteer for that

9 service.  *Id.*, pp. 39-40.  Plaintiff testified that Christmas and Easter services were cancelled.  *Id.*,

10 p. 44.

11

### (c) Wednesday Evening LDS-sponsored Service

12       The Wednesday evening service was an LDS-sponsored music service which was held

13 in the chapel from approximately 5:30 to 6:30 p.m. (#51, Exhibit 1, pp. 12-13, 46-47).  Plaintiff

14 affirms that previously the service was inmate-led and there was no outside volunteer (#66,

15 Exhibit A, ¶ 7).  After the service was cancelled, plaintiff contacted LDS officials and was

16 informed that there were no available volunteers for Wednesday evenings (#51, Exhibit 1, pp. 49-

17 50).  During the summer of 2006, a Kairos volunteer named Rick Bro started another group in

18 that time slot.  *Id.*

19

### (d) Sunday Afternoon LDS Service

20       Finally, plaintiff testified that during the time in question, he consistently attended the

21 Sunday afternoon LDS service, for which there were always available volunteers (#51, Exhibit

22 1, p. 46, 52).  However, this service was cancelled approximately five to six times because

23 security did not feel like escorting volunteers to the chapel.  *Id.*, p. 53.

24

### (3) RLUIPA and First Amendment Claims

25       Initially, the court addresses some general concerns.  First, it is clear that defendant

26 Donat's policy directly conflicts with AR 810.  AR 810 is applicable to "all employees,

volunteers, and inmates in the custody of the Department," and specifically allows for inmate-led

9

services *or* services led by volunteers (#51, Exhibit 3, AR 810.05 (1.1.1)) (emphasis added).
Defendant Donat states that he instituted his new policy in December 2005 by "issuing an order"
and "advising" all religious groups that they could not meet without an outside volunteer present
and that inmates could not lead services (#54, Decl. of Bill Donat, ¶¶ 11, 15).  Aside from citing
"security concerns," which the court addresses below, defendants cite no case, statute, or
regulation which allows defendant Donat to unilaterally overrule a generally applicable NDOC
regulation.  The court's review of AR 810 does not indicate that the policy is discretionary –
rather, AR 810 regulates inmate religious practices on a system-wide basis.  Interestingly, former
NDOC Director Nash Holmes appears to have been aware that defendants' policy conflicted with
AR 810 as noted in her March 10, 2006 response upholding an inmate grievance (#66, Exhibit
B).

Next, the court notes that defendants do not submit defendant Donat's policy for the
court's review.  The court has no information as to how defendants' policy is carried out – for
example, who is responsible for finding outside volunteers, how are they located, how long the
search lasts, and who makes the final decision that a group is permitted or prohibited from
proceeding without an outside volunteer.  Defendants' policy is not defined, and the defendants'
own evidence reveals that the rules were often changed depending on the circumstance.

Finally, the court is concerned that defendants' policy is not equally applied to all
religions.  Plaintiff testified and presented evidence that defendants permit other religious groups
to meet without outside volunteers and to lead their own services.  *See* #51, Exhibit 1, pp. 67-69;
*see also* #66, Exhibit A, ¶¶ 34-35; *see also* #66, Exhibit D.  Defendants admit that they treat
various religious groups at NSP differently, although, initially, defendants applied the new policy
to all religions equally (#54, Decl. of Bill Donat, ¶¶ 11-12).  However, after defendants' policy
ran into practical problems, defendants admit they made exceptions for a number of specific
groups.  *Id*.  Whether a group is permitted to meet without an outside volunteer depends on
whether that group has access to volunteers in the local area.  If there are no volunteers in the area
for a group, that group is permitted to meet and conduct inmate-led services under the purview

of correctional officers.  Groups that are able to locate volunteers within the local area are not

permitted to meet without the volunteer, nor are they permitted to conduct inmate-led services,

even if the volunteer is present.  *Id*. at ¶ 15.  The practical effect is that the more obscure, or

"minority," religions are permitted the rights outlined in AR 810, while members of more

mainstream religions are not.

Defendant Donat justifies his requirement that inmates not lead services by stating:

> Within the confines of a prison, it is never a good idea for inmates
> to "run" or have control over other inmates.  Inmates abuse the
> power they have over others.  Furthermore, the point of many of
> the programs offered (both religious and educational) are to
> expose the inmates to the "right" message.  Inmate leaders do not
> always do that.  There have been specific instances at NSP where
> rehabilitative groups have been used to recruit gang members.
> Therefore, to avoid these problems, volunteers are required to lead
> the religious services to the degree possible.

*See* #54, Decl. of Bill Donat. ¶ 15.  Defendants submit no evidence of these gang-recruitment

instances.  The court questions why, if it is of such importance that inmates not run their own

services, even with outside volunteers present, the defendants would allow some groups to do so.[5]

**(a) Law**

Plaintiff claims that defendants' policy violates his rights under RLUIPA and the First

Amendment.  Pursuant to RLUIPA:

> No government shall impose a substantial burden on the religious
> exercise of a person residing in or confined to an institution... even
> if the burden results from a rule of general applicability, unless the

---

[5] The court in no way questions defendants' determination that a need for more security for inmate groups existed in 2005.  Defendants' opinion that inmates should not meet without *some* supervision by correctional officers or security staff is clearly reasonable.  Defendants submit evidence that practical considerations, such as the age and structure of NSP, limits the supervision of the chapel, and the court agrees. However, defendants cite this as a main justification for the policy.  While the security of the chapel is relevant to when groups can meet in the chapel, it irrelevant to the issue of whether plaintiff's groups can meet without outside volunteers in other areas of the prison under the supervision of correctional officers.  This is what other groups have been permitted to do.  Defendants do not argue or submit evidence that there is not enough security staff to cover all the religious groups' meetings.  The requirement for outside volunteers appears related to defendants' opinion that inmates should not run prayer services.  As noted, this opinion conflicts not only with AR 810, but also with defendants' actual practice of allowing some groups to do so.

11

government demonstrates that imposition of the burden on that person

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  To establish a prima facie case under RLUIPA, the plaintiff bears the initial burden to prove that the defendants' conduct places a "substantial burden" on his "religious exercise."  *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005).

The Ninth Circuit recently discussed the meaning of "religious exercise."  *Green v. Solano Count Jail*, __ F.3d __, 2008 WL 170313 (9th Cir. , Jan. 22, 2008).  Quoting the Supreme Court, the Ninth Circuit stated, "[T]he 'exercise of religion' often involves not only the belief and profession but the performance of ... physical acts [such as] assembling with others for a worship service [or] participating in sacramental use of bread and wine."  *Id*. at *3, (citing *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005)).  At issue in *Greene* was a total ban on group worship for maximum security prisoners.  *Id*. at *2.  The Ninth Circuit held that the religious exercise at issue in the case was the prisoner's ability to engage in group worship, not his ability to practice his religion as a whole.  *Id*. at *3.

Although RLUIPA does not define "substantial burden," the Ninth Circuit has defined a substantial burden as one that is "'oppressive' to a 'significantly great' extent.  That is, a 'substantial burden, on 'religious exercise' must impose a significantly great restriction or onus upon such exercise."  *Warsoldier*, 418 F.3d at 995 (quoting *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)).  In the First Amendment context, the Supreme Court has found a substantial burden "'where the state ... denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs.'"  *Id*. (quoting *Thomas v. Review Bd. of the Ind. Employment Sec. Div.*, 450 U.S. 707, 717-18 (1981)).  "Although such 'compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.'"  *Id*.  The burdened religious exercise need not be central to, or compelled by, a system of religious belief.

12

1   *San Jose Christian College*, 360 F.3d at 1035; *see also* 42 U.S.C. 2000cc-5(7)(A).  Recently, the

2   Ninth Circuit found a substantial burden where prison policy prohibited maximum security

3   prisoners from worshiping in groups.  *Greene*, 2008 WL 170313 at *3 ("We have little difficulty

4   in concluding that an outright ban on a particular exercise is a substantial burden on that religious

5   exercise.").

6          Once the plaintiff establishes a substantial burden, the burden shifts to defendants to

7   demonstrate that the burden both furthers a compelling governmental interest and is the least

8   restrictive means of achieving that interest.  *Warsoldier*, 418 F.3d at 995.  Courts must take into

9   account the burdens a requested accommodation may impose on non-beneficiaries.  *Cutter v.*

10  *Wilkinson*, 544 U.S. 709, 720 (2005).  Preserving or maintaining good order, security, and

11  discipline and conserving limited resources constitutes a compelling governmental interest.  *Id*.

12  at 722-23 & n.13.  To that end, the court should apply RLUIPA's standard with deference to the

13  expertise of prison administrators.  *Id*.  RLUIPA "does not differentiate among bona fide faiths,"

14  and courts must be satisfied that RLUIPA's "prescriptions are and will be administered neutrally

15  among different faiths."  *Id*. at 720, 723.

16         Prison inmates also "'retain protections afforded by the First Amendment, including its

17  directive that no law shall prohibit the free exercise of religion.'"  *Henderson v. Terhune*, 379

18  F.3d 709, 712 (9th Cir. 2004) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987)).

19  To prove a free exercise violation, a plaintiff must demonstrate that defendants burdened his

20  religious beliefs.  *Shakur v. Schriro*, __ F.3d __, 2008 WL 185496, *3 (9th Cir., Jan. 23, 2008).

21  These beliefs must be both "sincerely held" and "rooted in religious belief."  *Id*. (rejecting the

22  centrality test set out in *Freeman v. Arpaio*, 125 F.3d 732 (9th Cir. 1997)).  The court's focus

23  should be on whether the prisoner sincerely believes that the activity in question is consistent with

24  his faith.  *Id*.  However, even if a sincerely held religious belief is burdened, defendants' conduct

25  will not violate the constitution if the action is reasonable.  *Id*. (citing *Turner v. Safley*, 482 U.S.

26  78 (1987)).  In *Turner*, the Supreme Court set out a four-part test: (1) whether there is a "'valid,

    rational connection' between the prison regulation and the legitimate governmental interest put

                                                13

1    forward to justify it"; (2) whether there are "alternative means of exercising the rights that remain

2    open to prison inmates"; (3) what "the impact accommodation of the asserted constitutional right

3    will have on guards and other inmates, and on the allocation of prison resources generally"; and

4    (4) whether the "absence of ready alternatives is evidence of the reasonableness of a prison

5    regulation." *Id*.

6                               **(b) Analysis**

7         It is clear that plaintiff's desire to gather in a group to worship, and to conduct inmate-led

8    services, constitutes "religious exercise" under RLUIPA.  *Greene*, 2008 WL 170313 at *3.

9    Defendants have not disputed that plaintiff sincerely believes that group worship and leading

10   inmate services is consistent with his faith.  *Shakur*, 2008 WL 185496 at *3.  Thus, these

11   activities qualify as "religious exercise" pursuant to RLUIPA.  The next question is whether

12   defendants' policy has burdened this exercise.

13        The court concludes that plaintiff has offered sufficient evidence to demonstrate that

14   defendants' policy created a substantial burden on both his religious practice and on mainstream

15   religions in general.  Defendants' policy requires religions to seek out outside volunteers for their

16   services.  Defendants have stated that most mainstream religions have volunteers in the area; thus,

17   inmates practicing those religions are now dependent on those volunteers to be present in order

18   to hold services.  Should a volunteer fail to arrive for an appointed service, or if no volunteer can

19   be secured for a particular time slot, inmates of that religion may not gather to worship, unlike

20   their counterparts in minority religions.  Nor can inmates lead these services – defendants' policy

21   ties the ability to lead a service to whether a group has a volunteer.  Had plaintiff been a member

22   of a minority religion that was not able to find a volunteer in the area, he would not have incurred

23   a burden on his practice because defendants have allowed such religions to continue as AR 810

24   permits.  Defendants have submitted no evidence as to why this is not possible for all religions.

25   Defendants' policy effectively penalizes plaintiff for his choice to practice a mainstream religion.

26   An outright ban on certain religious exercise – here, group worship and inmate-led services in the

     absence of a volunteer – constitutes a substantial burden.  *Greene*, 2008 WL 170313 at *3.

1        Having concluded that plaintiff has demonstrated a substantial burden, the burden shifts

2   to defendants to prove that the policy both furthers a compelling governmental interest and is the

3   least restrictive means of achieving that interest.  However, the court need not engage in this

4   analysis because the court concludes that defendants are entitled to qualified immunity.

5                              **(4) Qualified Immunity**

6        The defense of qualified immunity protects state officials sued in their individual

7   capacities unless the conduct complained of violates a clearly established constitutional or

8   statutory right of which a reasonable person would have known.  *Jackson v. City of Bremerton*,

9   268 F.3d 646, 650 (9th Cir. 2001).  A qualified immunity analysis begins with a threshold

10  question of whether, based upon facts taken in the light most favorable to the party asserting the

11  injury and in light of such clearly established law, an official's conduct violated a constitutional

12  right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If no constitutional right was violated, the court

13  need not inquire further.  *Id*.  However, if a constitutional violation occurred, the court's second

14  inquiry is whether the official could nevertheless have reasonably, but mistakenly, believed that

15  his or her conduct did not violate a clearly established constitutional right.  *Id*.

16       Since the court concluded above that defendants' policy violated plaintiff's rights, the next

17  inquiry is whether these rights were clearly established.  A constitutional right is clearly

18  established if the contours of the right are sufficiently clear that a reasonable official would

19  understand that what he or she was doing violated that right.  *Anderson v. Creighton*, 483 U.S.

20  635, 640 (1987).  "In the absence of binding precedent, a court should look at all available

21  decisional law including decisions of state courts, other circuits and district courts.... ." *Tribble*

22  *v. Gardner*, 860 F.2d 321, 325 (9th Cir. 1988) (citation omitted).

23       Several circuit courts, including the Ninth Circuit, have set out standards for what

24  constitutes a "substantial burden" pursuant to RLUIPA.  *See Adkins v. Kaspar*, 393 F.3d 559,

25  568-70 (5th Cir. 2004) (listing "substantial burden" tests used by other circuits).  The Supreme

26  Court has yet to address the issue.  This court's research reveals that the Ninth Circuit has not

specifically addressed the pertinent issues in this case.  However, the Fifth Circuit has held that

"the requirement of an outside volunteer – which is a uniform requirement for all religious assemblies at [the prison] ... – does not place a substantial burden on Adkin's religious exercise." *Id*. at 571.

*Adkins* is distinguishable from the instant case because the regulation in that case was uniformly applied, unlike here. *Id*. at 569 and n. 39. Further, the Fifth Circuit uses a slightly different legal test than the Ninth Circuit as to what constitutes a "substantial burden." *Id*. However, for the purposes of determining whether the law is clearly established, *Adkins* is the only case the court discovered which discussed these issues prior to 2005.[6] The court concludes that it was not clearly established in 2005 that defendants would place a substantial burden on plaintiff's religious practice by prohibiting group worship and conducting inmate-led services without an outside sponsor present. Thus, defendants are entitled to qualified immunity.

### (5) Equal Protection

Plaintiff also alleges that defendants' policy violated his equal protection rights (#36). The Fourteenth Amendment Equal Protection Clause "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which essentially is a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). The Clause "entitles each prisoner to 'a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Shakur*, 2008 WL 185496 at *9 (citing *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (*per curium*)). The court must analyze the prisoner's equal protection

---

[6] One other pre-2005 case was not directly on point. *See Murphy v. Missouri Dept. of Corrections*, 372 F.3d 979, 988 (8th Cir. 2004) (holding that there was a factual issue as to whether plaintiff's right to group worship was substantially burdened). The court notes that in 2007, the First Circuit upheld, without defining "substantial burden" or analyzing the issue, a district court's finding that a prison's ban on inmate-led services constituted a substantial burden in violation of RLUIPA. *Spratt v. Rhode Island Dept. of Corrections*, 482 F.3d 33, 38 (1st Cir. 2007). In so finding, the district court used the Supreme Court's "substantial burden" definition set out in *Thomas v. Review Bd. of the Ind. Employment Sec. Div.*, 450 U.S. 707, 717-18 (1981), which the Ninth Circuit also quoted in defining "substantial burden." *Warsoldier*, 418 F.3d at 995. Finally, the Ninth Circuit very recently found a substantial burden where prison policy prohibited maximum security prisoners from worshiping in groups. *Greene*, 2008 WL 170313 at *3. *Spratt* and *Greene* are both recent cases that were not available to defendants in 2005.

claim using the *Turner* factors.  *Id*.

Defendants have admitted that certain religious groups are permitted to meet without outside volunteers and to conduct inmate-led services, while other groups are not.  Thus, various religious groups at NSP are treated differently.  Defendants claim that plaintiff is not similarly situated to minority religious groups because the minority groups do not have available sponsors in the area to host meetings, unlike plaintiff's groups (#51, p. 22; #68 pp. 5-6).  As noted above, the court has no information before it regarding how sponsors are located, who is required to locate them, how long the search lasts, and when it is terminated.  Thus, it is impossible to determine whether the groups are, or are not, similarly situated.  This is an issue of fact.

Defendants also argue that they are not required to treat all groups exactly alike (#68, p. 5 (citing *Cruz* and stating, "prisons need not provide identical facilities or personnel to different faiths, but must make 'good faith accommodation of the [prisoners'] rights in light of practical considerations.'")).  The question is whether defendants have indeed acted in "good faith."  The fact that they have not abided by a system-wide NDOC regulation is a factor in this determination.  Finally, the court notes that the parties did not address the *Turner* factors in their briefs.  For these reasons, the court denies defendants' motion for summary judgment on plaintiff's equal protection claim.

### b. Music

#### (1) Allegations

Plaintiff alleges in count I that in 2005, he received permission to order a guitar, which he was allowed to retain as personal property (#36).  Plaintiff claims he used the guitar approximately ten hours a week, solely for worship and for related religious practices.  Plaintiff alleges that on December 5, 2005, defendants confiscated his guitar after deciding it was a security risk, without any allegation of wrongdoing against plaintiff.  Plaintiff further alleges that defendants required him to send his guitar out, and would only allow the guitar to remain at NSP if plaintiff turned ownership of the guitar over to NSP.  Plaintiff claims that defendants did not consider the least restrictive alternatives in confiscating his guitar, including requiring a "check-

1  out" and inspection system or restricting use to certain areas.  Plaintiff alleges that he has not been

2  able to participate in sacred music, except for on a few occasions when a guitar was provided by

3  a volunteer, since December 2005.  Plaintiff also alleges in count II that defendants violated his

4  right to equal protection when they prohibited his guitar, but allowed Native Americans to retain

5  their drums.

6                                          **(2) Evidence**

7        AR 711 governs inmate personal property, and provides that "Musical instruments may

8  be authorized at medium or below security institutions/facilities, at the discretion of the Warden"

9  (#51, Exhibit 5, AR 711.08 (1.2)).  "Cumbersome" instruments, such as "bass, viola, drums, etc."

10  are not permitted.  *Id.*  AR 810 provides that clergy or volunteers may bring into the facility

11  "ceremonial materials, liturgical items, study materials, and audio or video materials or equipment

12  needed to conduct their worship services" (#51, Exhibit 3, AR 810.05(1.3)).

13        Defendant Donat states in his declaration that when he became NSP warden, there were

14  concerns with the "band room," which was really a room covered in egg cartons (#51, Decl. of

15  Bill Donat, ¶ 7).  Defendant Donat states that the Fire Inspector confirmed the room was a safety

16  hazard.  *Id*.  When the band room was closed, defendant Donat prohibited guitars and keyboards

17  at NSP.  *Id*.  Defendant Donat notes that inmates had previously been allowed to store their

18  instruments in their cells, but states that this was problematic for several reasons.  *Id*. at ¶ 8.

19  Guitar strings could be (and had been) used as weapons, the instruments took up a lot of the

20  limited cell space, the possession of instruments was not properly documented, and the value of

21  many of the instruments exceeded the maximum value of the permitted personal property.  *Id*.

22  Defendant Donat considered allowing inmates to donate the instruments to NSP as an alternative;

23  however, he states that this was unsatisfactory to the inmates.  *Id*.

24        Plaintiff submits a grievance response which indicates musical instruments were supposed

25  to be kept in the "band room," but that it had been closed.  *Id*.  The response noted that the

26  warden has the discretion to authorize musical instruments, and that he had "implemented no

musical instruments at Nevada State Prison."  *Id*.  Plaintiff's grievance was denied at all levels.

18

*Id.* Plaintiff testified that he participated in Tuesday evening music theory classes, during which he taught using only gospel music (#51, Exhibit 1, pp. 55-56). Plaintiff admitted that volunteers are permitted to bring musical instruments into the services, but testified that during the time that Chaplain Jane was on medical leave, he had no access to any musical instruments or cassette tapes. *Id.*, p. 92-93. Plaintiff affirms that playing music became "the primary expression of my worship" (#66, Exhibit A, ¶ 30).

Plaintiff also testified that he saw a Native American drum hanging on the cell wall of an inmate living down the hall from him (#51, Exhibit 1, p. 71). Defendant Donat admits that Native Americans were permitted to retain their drums, but justifies this decision by stating that Native Americans do not have outside volunteers to bring drums to services, the drums are "a single small drum," and the drums do not pose the same security problems as guitars and keyboards, which can be used as weapons (#51, Decl. of Bill Donat, ¶ 9).

### (3) RLUIPA and First Amendment

Plaintiff alleges the ban on guitars places a substantial burden on his religious exercise. As noted above, a substantial burden is one which imposes "a significantly great restriction or onus upon" religious exercise. *Warsoldier*, 418 F.3d at 995. The court finds no substantial burden. By banning guitars and keyboards, defendants have not prevented plaintiff from practicing his religion. Plaintiff may continue to worship without his guitar and attend services. Moreover, plaintiff may worship through music by singing, by playing the audio tapes or instruments provided by volunteers, or by using the equipment located in the chapel. Although these options may not be plaintiff's first choice, they are nonetheless alternatives to playing his guitar at various religious services. Plaintiff has not been made to choose between practicing his religion or punishment, nor have defendants put substantial pressure on plaintiff to modify his religious beliefs. *Warsoldier*, 418 F.3d at 995. Since there is no substantial burden, the court grants defendants' motion for summary judgment on his RLUIPA and First Amendment claims.

### (4) Equal Protection

AR 711 allows inmates to possess musical instruments, at the Warden's discretion, and

prohibits "cumbersome" instruments (#51, Exhibit 5, AR 711.08(1.2)).  The prohibition against guitars and keyboards applies equally to all inmates, no matter their religion.  Thus, the court must determine whether the policy is reasonably related to legitimate penological interests pursuant to *Turner v. Safley*, 482 U.S. 78 (1987).  The court concludes that it is.

Defendants have met the first *Turner* factor by setting out a "valid, rational connection" between the prohibition on guitars and security.  The undisputed evidence, which is not hard to imagine, indicates that guitar strings have been used as weapons in the past.  Plaintiff has presented no evidence that Native American drums present the same security concerns as guitars.  As to the second factor, defendants have presented evidence that plaintiff has alternative means of exercising his desire to worship through music, by playing other instruments, listening to audio tapes, using guitars when volunteers bring them, and through singing.  Defendants have also demonstrated that accommodating plaintiff's request to keep his guitar in his cell would be dangerous to guards and other inmates – even if plaintiff will not use the guitar as a weapon, other inmates could find a way to do so.  Plaintiff is correct in pointing out that there are other reasonable alternatives available to prison officials aside from an outright ban on guitars, including allowing plaintiff to store his guitar elsewhere in the prison, and "check-out" the guitar for religious use only.  However, the Supreme Court has rejected the idea that prison officials must "set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Turner*, 482 U.S. at 90.  Overall, the factors weigh in favor of defendants.  As there appear to be clear security concerns at issue, the court grants defendants' motion for summary judgment.

///

///

///

///

///

///

### III. CONCLUSION

Based on the foregoing and for good cause appearing, the court concludes that:

1. Defendants Donat and Baca cannot be sued in their official capacities for money damages;

2. Plaintiff does not have standing to bring a claim for prospective injunctive relief because he has been transferred to another facility, and cannot demonstrate that he is in immediate danger of sustaining a real or direct injury;

3. Defendants' policy requiring outside sponsors and prohibiting inmates from leading services substantially burdens plaintiff's religious exercise;

4. Defendants are entitled to qualified immunity because there was no clearly established law in 2005 such that defendants would have reasonably known they were placing a substantial burden on plaintiff's religious rights;

5. There are genuine issues of material fact as to whether plaintiff is similarly situated to inmates of other religions which are permitted to meet without outside sponsors and to conduct inmate-led services. Further, there are issues of fact as to whether defendants' policy is reasonably related to legitimate penological interests;

6. Defendants' policy prohibiting guitars and keyboards does not constitute a substantial burden on plaintiff's religious practice because plaintiff is still able to worship without his guitar; and

7. Defendants' policy prohibiting guitars and keyboards does not violate plaintiff's equal protection rights because defendants' evidence demonstrates that their policy is applied equally to all religions and is reasonably related to legitimate penological interests.

As such, the court recommends that plaintiff's motion for summary judgment (#45) be **DENIED**. The court further recommends that defendants' motion for summary judgment (#51) be **DENIED** as to plaintiff's equal protection claim concerning his ability to meet without outside sponsors and conduct inmate-led services, and **GRANTED** as to all other claims.

The parties are advised:

1. Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this report and recommendation within ten days of receipt. These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

21

2.    This report and recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

## IV.  RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that plaintiff's motion for summary judgment (#45) be **DENIED**.

**IT IS FURTHER RECOMMENDED** that defendants' motion for summary judgment (#51) be **DENIED** as to plaintiff's equal protection claim concerning his ability to meet without outside sponsors and conduct inmate-led services, and **GRANTED** as to all other claims.

**DATED:** February 8, 2008.

_Valerie P. Cooke_
_____
**UNITED STATES MAGISTRATE JUDGE**